## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

VALVELLA T. McNEAL,

   Plaintiff,

   v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

   Defendant.

No. 14 C 3722

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Valvella T. McNeal filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq, 1381 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a request to reverse and remand the ALJ's decision. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover DIB or receive SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 978

(N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, stops the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are set forth at 20 C.F.R. § 416.901 et seq. The standard for determining DIB and SSI are virtually identical. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on February 11, 2010, alleging that she became disabled on July 14, 2008, due to carpal tunnel syndrome. (R. at 20, 156, 163, 214). The applications were denied initially and upon reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 20, 74, 81, 90). After an initial hearing was continued to allow Plaintiff to obtain representation, Plaintiff, represented by counsel, appeared and testified at a hearing before an Administrative Law Judge (ALJ) on October 25, 2012. (*Id.* at 20, 33–59, 60–69). The ALJ also heard testimony from Aimee Mowery, a vocational expert (VE). (*Id.* at 20, 33–59, 151–53).

The ALJ denied Plaintiff's request for benefits on January 14, 2013. (R. at 20–27). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since July 14, 2008, her alleged onset date. (*Id.* at 22). At step two, the ALJ found that Plaintiff's obesity, asthma, bilateral carpal tunnel syndrome, left cubital syndrome, De Quervain syndrome,[2] and right knee degenerative changes are severe impairments. (*Id.* at 22–23). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 23).

The ALJ then assessed Plaintiff's Residual Functional Capacity (RFC) and determined that Plaintiff has the RFC to perform sedentary work involving:

---

[2] De Quervain syndrome "is a tenosynovitis of the sheath or tunnel that surrounds two tendons that control movement of the thumb."
<https://en.wikipedia.org/wiki/De_Quervain_syndrome>

no more than frequent use of hands for handling, fingering, feeling or reaching and no more than occasional: pushing and pulling using the upper extremities, bending, balancing, stooping, kneeling, crouching and crawling; in a work environment permissive of: alternating between sitting and standing positions that allows one to stand one to two minutes after sitting for an hour; and exclusive of: ladder, rope or scaffold climbing requirements. [Plaintiff] should avoid concentrated exposure to work hazards such as being around dangerous moving machinery, working at protected heights and operator [*sic*] motor vehicles and avoid concentrated exposure to lung irritants.

(R. at 23; *see id.* at 23–25). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff is unable to perform any past relevant work. (*Id.* at 26). At step five, based on Plaintiff's RFC, her vocational factors, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including information clerk, interview clerk, and address/office clerk. (*Id.* at 26–27). Accordingly, the ALJ concluded that Plaintiff was not under a disability, as defined by the Act, from the alleged onset date through the date of the ALJ's decision. (*Id.* at 27).

The Appeals Council denied Plaintiff's request for review on March 20, 2014. (R. at 1–4). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regula-

tions. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*,

763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff worked for eighteen years as a bus driver. (R. at 216). On January 4, 2008, she reported to the emergency room after experiencing a sudden sharp pain in her left hand and arm upon pulling the air brake. (*Id.* at 398–402). On January 9, primary care physician Judith Law, M.D., diagnosed the pain and tenderness in the center of Plaintiff's left palm and on the inside of her wrist as a left wrist sprain. (*Id.* at 277–78). Plaintiff continued to experience left wrist and forearm pain, sometimes with numbness and visible swelling, in additional visits to Dr. Law on January 21, February 1, and February 21, 2008. (*Id.* at 279–83). Though she found some relief from ibuprofen and a wrist splint, two sessions of physical therapy did not change the symptoms. (*Id.* at 279, 283).

Plaintiff consulted with Victor Romano, M.D., an orthopedic surgeon at Trinity Orthopaedics, in March and April 2008. (R. at 417). An MRI revealed a ligament tear and joint instability. (*Id.*). Dr. Romano prescribed a custom-made splint and instructed her to continue with physical therapy. (*Id.* at 484, 417). Dr. Law again observed swelling and tenderness in her left wrist and hand on May 31, 2008. (*Id.* at 286). On July 3, Plaintiff reported that she sometimes removed the wrist splint at home, but felt pain from activity. (*Id.* at 288). Nevertheless, she felt some improvement and attempted to return to work on July 9. (*Id.* at 292). Her symptoms re-

turned within two days of driving the bus, and within four days were so severe that she again quit working. (*Id.* at 292, 418). Dr. Law observed on July 23, 2008, that her left distal forearm was still slightly swollen, with tenderness, pain on full extension or flexion, and a grip that was good initially but lost strength. (*Id.* at 293). In August, her left hand was numb to the point that she was unknowingly dropping things. (*Id.* at 294). On September 16, 2008, Dr. Romano examined her and assessed a left triangular fibrocartilage complex (TFCC) tear and possible developing cubital tunnel syndrome. (*Id.* at 418). On October 28, 2008, as her pain persisted and numbness in her hands was causing her to drop things, Dr. Romano prescribed an elbow mold and additional physical therapy. (*Id.*). On November 25, he opined that, although the TFCC tear had "healed nicely," because of left cubital tunnel syndrome, Plaintiff had no relief from pain even with physical therapy and use of a brace. (*Id.* at 418–19). She had limited use of her left hand, and elected to schedule cubital tunnel release surgery. (*Id.*). On November 28, 2008, Dr. Law observed that she had no opposition of her thumb on the left hand. (*Id.* at 302).

Dr. Romano performed Plaintiff's left cubital tunnel release surgery on December 19, 2008. (R. 383–84). Even as Plaintiff's left hand improved in January through March 2009, she reported pain and numbness in her right hand and elbow. (*Id.* at 419–20). Dr. Romano opined that Plaintiff had also developed right cubital tunnel syndrome from her work as a bus driver, as a result of keeping her arm bent on the steering wheel continuously. (*Id.* at 420). An EMG performed in June 2009 was positive for mild carpal tunnel on the right. (*Id.* at 306, 381–82, 422). Plaintiff reported

persistent right arm pain and numbness to Dr. Romano on August 11 and to Dr. Law on August 20, along with new recurrent pain in her left wrist. (*Id.* at 308–09, 422–23). Dr. Romano assessed right cubital tunnel syndrome in addition to the carpal tunnel syndrome. He planned a right cubital tunnel and carpal tunnel release surgery, which he performed on August 24, 2009. (*Id.* at 406–07).

As she healed from the surgery on her right arm, Plaintiff reported increased pain and numbness in the left wrist in September 2009. (R. at 424). Dr. Romano assessed that her TFCC injury had resolved, but that mild tendinitis and possible carpal tunnel syndrome in the left arm remained. (*Id.* at 424–25). An October 2009 EMG for left carpal tunnel, however, proved negative. (*Id.* at 425). In October and November, Dr. Romano assessed flexor tenosynovitis (inflammation of the sheath of the tendon) of the wrist. (*Id.* at 425–26). In December 2009, Dr. Law noted pain in Plaintiff's left palm, with her left forearm visibly tender and swollen with a mildly decreased grip. (*Id.* at 310–11). Dr. Romano recorded pain and swelling, and weakness of the left hand especially when trying to grip objects. (*Id.* at 426). Ongoing therapy provided little relief. (*Id.* at 424–27).

In January 2010, Dr. Romano noted that Plaintiff experienced some intermittent right elbow and wrist pain as a result of doing more with her right hand while her left was debilitated. (R. at 427). He opined that she had chronic tenosynovitis of the left forearm and wrist, suggestive of chronic compartment syndrome. (*Id.* at 427–28). A January 25, 2010 MRI confirmed tenosynovitis with fluid on the radiocarpal

joint. (*Id.* at 428). Dr. Law also noted left forearm swelling, numbness, and tenderness on February 15, 2010. (*Id.* at 312).

On February 19, 2010, Dr. Romano performed Plaintiff's third wrist surgery, a left carpal tunnel release and volar compartment decompression of the forearm. (R. at 354–55, 429). Dr. Law noted persistent pain with a very poor grip in her left forearm in April 12, 2010. (*Id.* at 450–51). Her right arm exhibited tenderness. (*Id.* at 451). On April 20, 2010, state agency reviewer David Mack, M.D., noted that Plaintiff had undergone left wrist surgery in February 2010 but opined that her healing would progress to the point that her condition would be nonsevere within 12 months of surgery. (*Id.* at 431–33). In April 2010, Dr. Romano noted some decreased sensation and a fair amount of weakness in the left hand, which improved over the next month with physical therapy. (*Id.* at 464). On June 22, 2010, Dr. Romano opined that she could perform work with no lifting of greater than 15 pounds and no bus driving; however, Plaintiff remained off work since no light duty was available. (*Id.* at 441, 464). On August 3, 2010, when Plaintiff still had persistent pain and swelling, Dr. Romano opined that one more month of therapy would bring her to maximum medical improvement, "and then we can decide what her disabilities are after that." (*Id.*). After two additional evaluations in September and October 2010, Dr. Romano opined that Plaintiff was at maximum medical improvement and he had nothing more to offer, suggesting that she undergo Functional Capacity Evaluation (FCE) to determine what work she was capable of doing. (*Id.* at 476).

An FCE performed on November 18, 2010, concluded that Plaintiff was capable of exertions at a "light" physical demand level, lifting up to 20 pounds occasionally and 10 pounds frequently. (R. at 476, 522, 529). She could not, however, maintain a sustained reach to a bus steering wheel for greater than 5½ hours a day, which fell short of the requirements for work as a bus driver. (*Id.* at 523). A state agency reviewer, B. Rock Oh, M.D., opined on November 29, 2010, that despite some swelling, Plaintiff's condition was expected to be nonsevere by February 19, 2011, a year after her surgery date. (*Id.* at 467). Though her orthopedic surgeon, Dr. Romano, recommended a work conditioning program on December 7, 2011, the request was denied. (*Id.* at 476). Dr. Romano discharged her from his care on January 18, 2011, opining that she could perform a light physical demand job lifting no more than 20 pounds occasionally and 10 pounds frequently. (*Id.* at 476).

Dr. Law noted that Plaintiff's left forearm still caused pain in April 2011, despite a home exercise program. In May, the left arm hurt with activity and was visibly swollen. (R. at 495, 497–98). On May 31, 2011, Dr. Law wrote an opinion letter in which she stated that Plaintiff continued to have pain in her left hand and swelling in her left forearm, and that she could not return to work as a bus driver but could work with limited lifting of no more than 20 pounds occasionally and 10 pounds frequently. (*Id.* at 520).

On August 3, 2011, Dr. Law noted an increase in symptoms, including daily pain on the inside of Plaintiff's right forearm, constant numbness in the left hand and forearm, and the inability to pick up 15 pounds with both hands. (R. at 499–500).

She also made note of arthritis in the right knee. (*Id.*). On August 12, 2011, Plaintiff filed an updated Disability Report averring that her hand was "getting worse even after the surgery." (*Id.* at 244). On September 20, she again visited Dr. Law, reporting increased pain in her right knee, which popped with flexion, as well as sharp pain in her right wrist when she used her right hand. She also had swelling in the left forearm with numbness in the thumb and forefinger. (*Id.* at 502). On September 20, 2011, Plaintiff returned to Dr. Romano for the first time since January, reporting persistent pain, tingling, and numbness of her hand, worsened by light housework and by playing with her grandchildren. Dr. Romano again assessed persistent tenosynovitis of the wrist and residual numbness after her carpal tunnel release surgery. He did not think further surgery would be helpful. (*Id.* at 476–77). On October 12, 2011, Plaintiff presented to Dr. Law limping from arthritic pain in her right knee, which was treated with a cortisol injection. (*Id.* at 504–05).

On November 5, 2011, Dr. Law completed an RFC Questionnaire in which she confirmed Plaintiff's bilateral forearm and wrist impairments, as well as the arthritis in her right knee. (R. at 470–74). Clinical findings noted tenderness and swelling. (*Id.*). Dr. Law opined that Plaintiff could stand for no more than five minutes at a time, and that she could sit for at least six hours and stand or walk for less than two hours in an eight-hour workday. (*Id.* at 472). She indicated that Plaintiff would need to be able to shift positions at will from sitting, standing, or walking, and that she would sometimes need unscheduled breaks. (*Id.*). She opined that Plaintiff could never carry weights of 10 pounds or more in a work setting, and could only rarely

carry weights of less than 10 pounds. (*Id.* at 473). In addition, she could grasp, turn, and twist objects for no more than five percent of her work day, and could engage in fine manipulations or reaching actions for no more than half the day, with either hand. (*Id.* at 474). Finally, Dr. Law opined that Plaintiff's pain or other symptoms would frequently interfere with her attention and concentration, and she would will miss more than four days of work per month due to her impairments or treatment. (*Id.* at 470, 474).

In February 2012, Plaintiff continued to experience right knee pain. (R. at 545). Dr. Law referred her to orthopedic surgeon Mark Cavalenes, M.D., who, over a period of several months, treated her knee pain with additional injections and with arthroscopic surgery to repair a torn meniscus. (Id. at 554, 557, 571, 592, 594). On May 1, 2012, Dr. Law observed that, in addition to knee symptoms, Plaintiff demonstrated tenderness in her left forearm. (*Id.* at 528). Despite her May 2012 knee surgery, she reported achiness and soreness in both hands and both knees in August 2012, and the following month received another shot to treat recurrent pain in her knee. (*Id.*). Physical therapy records dated August 31, 2012, indicated that she also continues to experience numbness and tingling in her arms, increasing with activity. (*Id.* at 568). At a September 19, 2012 doctor visit, the most recent treatment note of record, Plaintiff continued to report pain in both hands and in her knees. (*Id.* at 598).

In her hearing before the ALJ on October 25, 2012, Plaintiff testified that her right knee is still "very painful from time to time." (R. at 39). In addition to medica-

tions, surgery, and cortisone shots, Plaintiff alleviates her pain with BenGay and a heating pad, and by elevating her legs. (*Id.* at 39, 47–48). She can sit for only 20–30 minutes before her knees start to throb in the bent position. (*Id.* at 49). She uses a cane to walk and rides a scooter at the grocery store. (*Id.* at 41, 44–45). She does light housework in short intervals of 20–25 minutes, but her son and daughter do the heavy housework. (*Id.* at 45, 47, 51). In addition, the swelling in her left wrist has never gone down after her surgery. (*Id.* at 50–51). Though therapy has helped with her strength, her left wrist is still "numb and painful" and locks during daily activities, and she has trouble reaching overhead or in front of her with either hand. (*Id.* at 41, 48–49). She sometimes drops things, has trouble gripping, and has switched to plastic dishware to avoid breaking things. (*Id.* at 42, 50). Writing causes her fingers to go numb, and typing causes pain in her hand and wrist. (*Id.* at 50). She has trouble sleeping at night and takes naps during the day, and has difficulty focusing because of pain. (*Id.* at 42–43, 49).

## V. DISCUSSION

Plaintiff raises three arguments in support of her request for reversal: (1) the ALJ erred in rejecting the opinion of her treating physician; (2) the ALJ's determination of Plaintiff's RFC was not supported by substantial evidence; and (3) the ALJ erred in evaluating Plaintiff's credibility. (Dkt. 14 at 1).

### A. The ALJ Failed to Articulate Good Reasons for Discounting the Opinion of Plaintiff's Treating Physician.

Plaintiff contends that the ALJ erred in giving "little weight" to the November 5, 2011 RFC assessment of her primary care physician, Dr. Law. In that report, Dr.

Law opined, *inter alia,* that Plaintiff could never lift objects of 10 pounds or more and could rarely lift objects of less than 10 pounds; could use her hands to grasp, twist, or turn objects for no more than five percent of a work day; and would likely be absent more than four days per month due to her conditions and treatment. (R. at 473–74).

In Social Security disability claims, the opinion of a treating physician is afforded controlling weight if it is both "well-supported" by clinical and diagnostic evidence and "not inconsistent with the other substantial evidence" in the case record. 20 C.F.R. § 404.1527(c)(2); *Scott v. Astrue,* 647 F.3d 734, 739 (7th Cir. 2011); *see Loveless v. Colvin,* 810 F.3d 502, 507 (7th Cir. 2016). Because of a treating doctor's "greater familiarity with the claimant's condition and circumstances," *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir. 2003), an ALJ must "offer good reasons for discounting a treating physician's opinion," *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted); *see also Stage v. Colvin,* 812 F.3d 1121 (7th Cir. 2016). Those reasons must be "supported by substantial evidence in the record; a contrary opinion of a non-examining source does not, by itself, suffice." *Gudgel,* 345 F.3d at 470. Where the opinions of treating and nontreating physicians contradict one another, the ALJ must decide which doctor to believe, considering such factors as "the length, nature, extent of the treatment relationship; frequency of examination; [each] physician's specialty, the type of tests performed, and the consistency and supportability of [each] opinion." *Scott,* 647 F.3d at 740; *Books v. Chater,* 91

F.3d 972 (1996). The ALJ must then provide a "sound explanation" for that decision. *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir. 2011).

Without mentioning Dr. Law by name or making reference to her status as Plaintiff's treating physician, the ALJ elected to give "little weight" to Dr. Law's November 5, 2011 RFC Questionnaire. (R. at 25). The ALJ offered three reasons in support of this decision. First, she stated that the medical record "in no way supports the limitations assessed" by Dr. Law. (*Id.*). Second, she found the physician's opinion contradicted by the fact that Plaintiff mentioned caring for a grandchild in December 2011. (*Id.*). Third, she found Dr. Law's opinions inconsistent with the success of Plaintiff's knee treatments including injections and surgery. (*Id.*).

Without further explanation, the ALJ's decision to give Dr. Law's opinion "little weight" is legally insufficient and not supported by substantial evidence. First, the ALJ did not specify which parts of Dr. Law's opinion she found to be lacking support in the medical record. Further she did not indicate which specific findings in the medical record led her to that finding. She has therefore omitted from her explanation "enough detail and clarity to permit meaningful appellate review." *Briscoe*, 425 F.3d at 351. Indeed, she cited no specific portions of Dr. Law's opinion at all, instead summarizing its multiple findings as "lower and upper extremity related symptoms so severe as to preclude all competitive employment," and disagreeing with that conclusion. (*Id.* at 25).

Second, the brief reference to Plaintiff's care for a grandchild (*see* R. at 540–41) does nothing to further illuminate the ALJ's reasoning, as the record provides no

information about the age of the grandchild, any particular care activities that Plaintiff performed, or whether she experienced symptoms from those activities. Finally, as to the relief provided by knee injections and surgery, there is evidence that any improvements were short-lived. A February 2012 note indicates that relief from knee injections lasted three to six months, and an injection that day did not eliminate the need for knee surgery three months later, on May 2, 2012. (*Id.* at 557, 592, 595). Despite that surgery, Plaintiff reported knee pain in August 2012 and received an additional cortisone injection in September 2012. (*Id.* at 591). Additionally, whether or not she found relief from her knee treatments, Plaintiff continued to report hand, wrist, and elbow symptoms in August 2011 (*id.* at 476–77, 499–500) and in May through September 2012 (*id.* at 528, 568, 591, 598), ongoing problems the ALJ did not assess in her evaluation of Dr. Law's opinion. Though the ALJ need not discuss every shred of evidence in the record, she "may not ignore an entire line of evidence" that runs contrary to her conclusions. *Golembiewski v. Barnhart,* 322 F.3d 912, 917 (7th Cir. 2003).

Furthermore, even where an ALJ articulates good reasons for withholding controlling weight from a treating physician's opinion, the ALJ is still required to determine what weight, if any, to give it, evaluating the opinion in light of a series of regulatory factors set forth in Social Security regulations. *Scott*, 647 F.3d at 740. Here, the ALJ did not articulate any analysis of the statutory factors with respect to Dr. Law's opinion, outside of her bare assertion that the opinion's overall conclusions lacked support in the record. The ALJ, in omitting mention of the existence of

a treatment relationship, also omitted any analysis of the required factors including the nature, length and extent of the doctor-patient relationship, the frequency of examination, and the type of tests performed.

In sum, the ALJ failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele,* 290 F.3d at 941 (internal quotation omitted). This prevents the Court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott,* 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight to be afforded Dr. Law's opinion. If the ALJ finds "good reasons" for not giving the opinion controlling weight, *see Campbell,* 627 F.3d at 306, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir. 2009), in determining what weight to give the opinion, *see also Scrogham v. Colvin,* 765 F.3d 685, 697 (7th Cir. 2014) ("Even when an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ is not permitted simply to discard it. Rather, the ALJ is required by regulation to consider certain factors in order to decide how much weight to give the opinion.").

## B. The ALJ Should Re-evaluate Plaintiff's Subjective Complaints in Accordance with SSR 16-3p.

Plaintiff also contends that the ALJ erred in evaluating her credibility. (Dkt. 14 at 1). The regulations describe a two-step process for evaluating a claimant's own

description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." Social Security Ruling (SSR)[3] 16-3p, at *2; *see also* 20 C.F.R. § 404.1529. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." SSR 16-3p, at *2. In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific

---

[3] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

The Social Security Administration recently updated its guidance on evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 16, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. Though SSR 16-3p post-dates the ALJ hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482–83 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999). Here, the new SSR specifies that its elimination of the term "credibility" in subjective symptom evaluation is intended to "clarify" its application of existing rules and to "more closely follow [Agency] regulatory language regarding symptom evaluation." SSR 16-3p, at *1. Moreover, the two Social Security Rulings are not patently inconsistent. Indeed, a comparison of the two reveals substantial consistency, both in the two-step process to be followed and in the factors to be considered in determining the intensity and persistence of a claimant's symptoms. *Compare* SSR 16-3p, *with* SSR 96-7p. Therefore, it is appropriate to consider Plaintiff's credibility argument and the ALJ's evaluation of Plaintiff's subjective complaints in light of the new guidance the Agency has provided.

reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 16-3p. An ALJ may not discredit a claimant's testimony about her symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("[T]he administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support the claimant. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 16-3p, and former SSR 96-7p, require the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted). The Court will uphold an ALJ's evaluation of symptoms if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss*, 555 F.3d at 561. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 940.

Here, Plaintiff objects to the ALJ's generalized statements that her "subjective complaints and alleged limitations find no support in the objective medical record to

show that she is incapable of sustaining gainful activity." (R. at 25; *see* Dkt. 14 at 13). Plaintiff argues that these general statements leave her in the dark about how the ALJ assessed her specific complaints of hand pain, numbness and other symptoms. (Dkt. 14 at 13). The Commissioner argues that the ALJ's assessment of each of Plaintiff's complaints is evident in the resulting RFC—that is, "any limitations included in the RFC finding are those the ALJ credited, while any limitations absent from the RFC finding are those discredited by the ALJ." (Dkt. 19 at 5). This shortcut is impermissible. The Seventh Circuit has repeatedly rejected conclusory statements that discredit an individual's claimed symptoms while failing to inform a reviewing court "in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (citations omitted). The Administration's rules clarify that, while an ALJ need not discuss any of the seven factors for which record evidence is lacking, the ALJ "will discuss the factors pertinent to the evidence of record." SSR 16-3p, at *7. Here, the record contains ample evidence relating to Plaintiff's daily activities, her pain, aggravating factors, treatments pursued, and other measures taken to alleviate her pain. (*See, e.g.,* R. at 39–51, 418–24, 476–77). The ALJ devoted very little discussion to these factors, and was extremely selective in the evidence she did mention. For example, the ALJ stated that despite Plaintiff's complaints of wrist pain on May 31, 2011, she "still was able to engage in housecleaning tasks and grocery shopping." (*Id.* at 25). In fact, the treatment note cited for that proposition states that when she did light cleaning, cooking, or shop-

ping for even one hour, it caused her left forearm to "hurt quite badly," forcing her to stop. (*Id.* at 497).

On remand, the ALJ shall reassess the severity, intensity, and persistence of Plaintiff's subjective symptoms in accordance with the requirements of 20 C.F.R. 404.1529(a) and the guidance provided by SSR 16-3p.

## C. RFC Assessment

Plaintiff's third argument for reversal or remand is that, because of the ALJ's errors in weighing opinion evidence and evaluating Plaintiff's own statements about her symptoms, the ALJ failed to adequately incorporate Plaintiff's limitations into the assessment of her RFC. Because the Court is remanding for the ALJ to properly assess the treating physician's opinion and to properly evaluate Plaintiff's subjective symptoms, the Court chooses not to address Plaintiff's final argument in full at this time. However, on remand, after determining the weight to be given Dr. Law's opinion and reassessing the severity, intensity, and persistence of Plaintiff's subjective symptoms, the ALJ shall reevaluate Plaintiff's impairments and her RFC, considering all of the evidence of record, and shall explain the basis of her findings in accordance with applicable regulations and rulings. "In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted). Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's request to reverse and remand [14] is **GRANTED**, and Defendant's Motion for Summary Judgment [18] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: April 21, 2016

*Mary M Rowland*

_____
MARY M. ROWLAND
United States Magistrate Judge